UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PHILLIP CANNELLA, et al.** | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | No. 12-CV-1247 |
| vs. | : | |
| | : | Judge J. Curtis Joyner |
| **"WATCH DOG"** | : | |
| | : | |
| and | : | |
| | : | |
| **JOHN DOES 1 - 9** | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

## PLAINTIFFS' MOTION FOR AN ORDER PERMITTING DISCOVERY IN ADVANCE OF RULE 26(f) CONFERENCE

Plaintiffs First Senior Financial Group, Phillip Cannella, and Joann Small, (collectively, the "Plaintiffs") respectfully request the Court issue an Order pursuant to Fed. R. Civ. P. 26(d)(1) allowing Plaintiffs to conduct limited discovery in advance of the Fed. R. Civ. P. 26(f) conference, as set forth in the Proposed Order attached hereto. Plaintiffs need to conduct discovery at this time to allow them to identify and name the Defendants who have anonymously posted false and defamatory statements on a website about Plaintiffs. These anonymous Defendants have tortiously interfered with Plaintiffs' business relationships, defamed Plaintiffs, and fraudulently advertised against Plaintiffs in violation of the Lanham Act. Plaintiffs have been unable to identify Defendants through a good-faith, thorough investigation into Defendants' identities. In support of their Motion, Plaintiffs provide a Memorandum in Support and the

Affidavits of Bruce Anderson and Plaintiffs' Insurance Advisors.    A Proposed Order is also

attached hereto.

Neil E. Jokelson
NEIL E. JOKELSON & ASSOCIATES
230 S. Broad St # 8
Philadelphia, PA 19102
(215) 735-7556

Whitney C. Gibson, *Admitted Pro Hac Vice*
(OH Bar No. 0077961)
VORYS, SATER, SEYMOUR & PEASE, LLP
301 East Fourth Street, Suite 3500
Great American Tower
Cincinnati, OH  45202
(513) 723-4000
(513) 852-7825  (Facsimile)

2

<u>**MEMORANDUM IN SUPPORT**</u>

**I.   <u>PRELIMINARY STATEMENT</u>**

Plaintiffs request leave to conduct discovery prior to the Rule 26(f) conference to obtain the identities of the individuals who have created a blatantly false and defamatory website with the stated intention to destroy Plaintiffs' business (hereinafter "Defendants' Website").   Using screen names to maintain their secrecy, Defendants have (1) already posted more than 80 factually false statements  about the Plaintiffs on Defendants' Website, (2) moved the website to the first page of Google results when someone uses that search engine to search for First Senior Financial Group's ("FSFG") founder, FSFG, and the CEO of FSFG, (3) repeatedly encouraged others to attempt to assist in destroying Plaintiffs' business on Defendants' Website, and (4) repeatedly advertised for their own competitive products on Defendants' Website.

To put it bluntly, Defendants' Website contains more defamatory information than any other case Vorys' internet defamation law group has ever seen.  To give just a few examples, the website states that FSFG's founder is a mobster, steals from his advisors, steals from seniors, steals from clients, has bribed state officials in Pennsylvania's Insurance Department,  spent 10 days in jail, is a crook, is a thief, is a con-artist, is corrupt, that his business is failing, that his dad is a mobster, that FSFG's major insurance carriers are terminating their contractual relationships with FSFG, that Plaintiff Joann Small slept with Plaintiff Phillip Cannella to get to the top, and many others.  All of these statements are blatantly and unequivocally false.  And,  in light of the volume and salaciousness of these attacks, they have caused Plaintiffs to lose millions of dollars worth of business.

Plaintiffs hired  cyber investigators to try to determine the identities of the persons making these damaging statements.  However, the investigators have found that the individuals

3

operating Defendants' Website have gone to great lengths to try to hide their identities and avoid any repercussions from their actions. The Defendants have engaged in misdirection, i.e., posting false information about themselves in order to mislead others as to their identity, and have moved their server to Panama, a place known as a safe haven for those who engage in illegal conduct anonymously on the internet. Despite the Defendants' great efforts, the investigator was able to determine that there are a number of subpoena points that have a reasonable likelihood of identifying the primary operator of the website, "Watchdog." Additionally, based on information on the website and testimony in another case, the depositions and documents of three separate witnesses are likely to lead to the identities of the individuals who have posted false and defamatory information on the Defendants' Website concerning Plaintiffs.

At this juncture, Plaintiffs simply request leave to conduct limited discovery prior to the Rule 26(f) conference to obtain the identities of only those individuals who have repeatedly made false and defamatory statements about Plaintiffs so they can serve them with the Complaint. Several courts, including the District Court for the Eastern District of Pennsylvania, have granted leave for plaintiffs to conduct discovery prior to the Rule 26(f) conference to determine the identity of anonymous persons on the internet so Plaintiffs can proceed with their claims against them. See e.g., Raw Films, Ltd. v. Does, 2012 U.S. Dist. LEXIS 41645, *14-26 (E.D. Pa. Mar. 23, 2012) (granting plaintiffs' motion to conduct discovery prior to the 26(f) conference to identify the anonymous persons on the internet and proceed with its claims against them.); McCluskey v. Belford High Sch., 2010 U.S. Dist. LEXIS 62608, *3-7 ( E.D. Mich. June 24, 2010) ("Accordingly, the Court grants Plaintiffs' motion to conduct discovery in advance of the Rule 26(f) conference for the limited purpose of discovering information needed to serve the individual Defendants."). The Proposed Order attached hereto is modeled after orders that courts

4

have issued in these other cases.  The Order, for example, prescribes specific procedures to ensure that the anonymous Defendants are given notice of Plaintiffs' subpoenas and have sufficient time to file any motions to quash or modify those subpoenas if they so desire.[1]  While Plaintiffs' counsel certainly believes any motions to quash under the facts of this case are baseless, the Proposed Order appropriately protects their ability to file objections.

In light of Defendants' malicious attacks and the damages they have caused, the Proposed Order should be entered.

## II.    FACTUAL BACKGROUND

### A.     First Senior Financial Group's Success Selling Insurance Products

FSFG is an insurance agency that provides financial information and insurance products to customers.  (Plaintiffs' Verified First Amended Complaint ("FAC"), at ¶ 8 ).  FSFG's focus is on helping individuals preserve their assets through retirement.  (Id.).  As an insurance agency, FSFG sells insurance products from reputable insurance carriers, such as Allianz and Lincoln Financial.  (Id.).  FSFG promotes its products directly to customers through independent insurance agents and through educational sessions sponsored by FSFG.  (Id. at ¶ 9).  Insurance agents meet with customers on three separate occasions prior to selling the product.  (Id.).  FSFG also promotes its products through speaking engagements conducted by Plaintiffs   Phillip

---

[1]      See AF Holdings LLC v. Doe, 2012 U.S. Dist. LEXIS 82690, *5-8 (N.D. Cal. June 14, 2012)   ("It is further ORDERED that the ISP will have days from the date of service upon it to serve Defendant with a copy of the subpoena and a copy of this order.  The ISP may serve Defendant using any reasonable means, including written notice sent to the last known address, transmitted either by first-class mail or via overnight service. The ISP and Defendant each shall have 30 days from the date of service to file any motions in this court contesting the subpoena [including a motion to quash or modify the subpoena].  If that 30-day period lapses without Defendant or the ISP contesting the subpoena, the ISP shall have 10 days to produce to Plaintiff the responsive information.");  McCluskey, 2010 U.S. Dist. LEXIS 62608, *3-7 ("Plaintiffs maintain that it would not be unfair to permit the discovery they request, as each non-party can seek to quash or modify a subpoena if appropriate and they choose to do.").

Cannella and Joann Small. (Id.). Mr. Cannella also promotes FSFG's products through a weekly radio show, educational seminars for customers, and media appearances. (Id.).

Due to Plaintiffs' business efforts, and the increased popularity of their insurance products, Plaintiffs' business was very successful from 2008 to 2010. (Id. at ¶10). Plaintiffs' primary insurance products are Fixed Index Annuities ("FIA"), which are extremely attractive for retirees because they provide them a contractual guarantee of receiving a guaranteed principal and minimum interest, while also receiving the benefits of potentially higher returns due to the annuities' tie to the stock market's indices. (Id.).[2] From 2008 to 2010, Plaintiffs' business selling these particular products grew tremendously, and as a result, FSFG earned approximately $8.3 million in 2009, and $9.75 million in 2010. (Id.).

**B.   Anonymous Poster, "Watchdog," Leads Competitors In A "Campaign" To Destroy Plaintiffs' Business.**

Due to the success of FSFG, other companies selling financial products in the region began losing customers. (Id. at ¶11). Rather than offer similar products, or develop other innovative products or strategies to compete, however, some of FSFG's competitors planned and executed an anonymous online website to post incredibly blatant and false information about Plaintiffs FSFG, Phil Cannella, and Joann Small. (Id.).

Specifically, starting in February 2011, an anonymous poster using the screen name "Watchdog" started posting an enormous amount of false information about FSFG on Defendants' Website with the admitted intent to "get [Mr. Cannella] off the air and out of business." (Id. at ¶12). Since then, he has posted so much false information on Defendants'

---

[2]      The products that FSFG sells have been approved by numerous agencies. Indeed, the University of Pennsylvania's Wharton School of Business recently published a study discussing the great performance of FIAs. (FAC, at ¶ 10). The BBB has given FSFG an A rating. (Id. at ¶ 8). No agency has found any problems with FSFG or the standard insurance products it sells.

Website that it would be impractical to include it in this Motion.   However, to give the Court an indication, below is a list of some of the false information that has been posted on Defendants' Website just under the screen name "Watchdog:"

- "Canella does not pay his advisors"

- "Cannella Steals From The Elderly To Fund A Training Gym"

- "Cannella Engages in Financial Planning, Not Licensed."

- "Cannella Lies About His Education."

- "Cannella Ran A 'Trust Mill' Called American Senior Information Services, It Was Shut Down By The PA Attorney General."

- "He regularly ripped off business partners and engaged in his 'GoldenAge' foundation scam."

- "The state gave him a PASS because he bought some folksn [sic] in the PA insurance commission."

- "Cannella has a history of violence, often directed at seniors to bully them into signing the application."

- "About the only time Cannella will appear before FINRA and the SEC will be after being subpoenaed because of *his illegal business practices*."

- "Where [Cannella] *knowingly stole* senior citizens money (*Very Illegal*) and used it for his own private purposes.  His not a senior advocate! *His is a crook*, plain and simple."

- "FSFG never services the client post sale"

- "[Cannella] is currently hurting seniors and has hurt seniors"

- "His business if failing.  His income has all but dried up.  He is now having difficulty paying his bills."

- "Cannella had lived what amounted to a life of crime without any consequence."

- "Top 10 Reasons to Not Invest With Cannella  1.  His top insurance carriers ended relationships with him so, access to the best annuity companies like worldwide insurance leader Allianz are not available."

- "Phillip J. Cannella III.  Perhaps the most corrupt member of the financial services community after Bernard Madoff."

- "PHIL CANNELLA BOUGHT OFF A PERSON OF INFLUENCE AT THE PA INSURANCE DEPARTMENT."

(Id. at ¶13).

In addition to these above examples of false statements under "Watchdog," Defendants' Website contains a massive number of false statements about FSFG, Mr. Cannella, and Ms. Small under other screen names.  For example, the screen name "Annuity Watchdog" states:

- "[Cannella's] claims are false, his methods highly unethical."

- "I'll tell you who, a lawless fraud."

- "The key in this dissertation [about Cannella] is insurance fraud."

- "Who cares, he is ripping off people and is one of the ugliest being on the inside in the world."

- "What carriers are left and who are the agents?  Thats why this criminal is no longer, the CEO."

(Id. at ¶14).

Likewise, the poster using the screen name "Phil's Nightmare" states:

- "[Cannella] has bribed public officials to look the other way"

- "Cannella may have gotten a pass up to now, but only because he bought off somebody in the PA Dept of Insurance."

- "he's a con artist/tax cheat/thief."

- "That's why he has no problem stealing money from his "av-vivors" [sic] and employees."

- "Look at what a tax cheat, thief, liar, scam artist he is . . . Maybe you'd like him to scam meony [sic] out of you to support his Golden Age Foundation?"

- "What you get from Cannella is a tax cheat giving tax advice, a self-prolcaimed "financial av-visor" giving investment advice without a

8

license, . . . and someone who has bribed public officials to look the other way . . ."

- "Joann Shouldn't be surprised to learn of Cannella's numerous sexual indiscretions, such as with Scamuffa and Bright."

(Id. at ¶ 15).

The poster using the screen name "NoteTaker" states:

- "Phil is a sociopath, people.  He lies about everything."

- "Cannella is such a fraud – and a coward."

- "Phil has stolen in excess of $1,000,000 in commissions rightfully due his advisors."

- "[Cannella] abused employees in innumerable was [including] … sexually."

- "Your entire career, all you've done is screw people over.  . . ."

- "Phil, you can be sure that prior to the hearing, WatchDog will have provided everyone on the committed and the SEC, FINRA and brokerage firm reps with a full dossier *on your illegal activities*."

- "This all has nothing to do with the fact that Cannella steals money (several million dollars) from senior clients using his Golden Age Foundation as a front."

- "Virtually all quality carriers have terminated Cannella's contracts.  Most of the carriers Cannella is left with are poorly rated, poorly capitalized, under funded, and their products are poorly structured to benefit the carrier more than the client.  Cannella is left with selling only the crappiest annuities."

- "You are a crook . . . You are a fraud . . . You are a criminal."

- "Since the prosecution will be able to easily identify the money you illegally stashed offshore, they'll argue that there may be more money hidden offshore."

(Id. at ¶ 16).

The poster using the screen name "Ugly's Truth" states:

9

- "[Ms. Small] has slept her way into power at every job she's every had."

- "Phil has been doing scams like the gold age foundation and many others no one know about (yet) for 35 years.  His is a scoundrel.  You see, without Joann Small, Phil would still be a crook."

- "She [Small] became romantically involved with her current husband and 'former boss,' when she worked for him at their insurance agency.  She reportedly, spent a lot of time in his office 'earning' her way to the top."

(Id. at ¶ 17).

The poster using the screen name "In the Know" states:

- "[H]e looks like a mobster (he is)"

- "His sales tactics are illegal"

- "Partners in crime on listeners dime. . . ."

(Id. at ¶ 18).

The poster using the screen name "tg" states:

- "[Canella] stole almost a $1 million as 'donations' and turned them into marketing money for himself and funded a for profit gym."

- "Cannella … are up to with the elderly's money [he] stole."

- "Now, to keep the engine running he has to spread themoney around like a criminal would to keep his activities and misdeeds from bringing him down the same way you see it in organized crime – the payoffs, bribes, etc."

- "999am is willingly embracing a known criminal as an advertiser who continues to abuse elderly victims."

(Id. at ¶ 19).

The poster using the screen name "Industry Heavy" states:

- "Phil steals at least $1M in commissions from former agents.  And that's before factoring in the abuse he heaps on his senior citizen clients."

- "Why did Cannella steal $1M in commission from advisors who worked for him?  PHIL CANNELLA IS A FRAUD!!!!!!!!!!!!!!!"

10

- "[Cannella] is money laundering and it's illegal."

- "Phil and Joann's illegal and unethical behavior."

- "Why did Cannella steal $1M in commissions from advisors who worked for him? The man is a wretched, corrupt, greedy, sociopathic SOB. To those FBI agents investigating the SEC Inspector General I say, direct your inquiry toward the real perpetrator, the real thief/tax cheat/crook, Phillip J. Cannella III. *If the PA Dept. of Insurance won't act because they're corrupt and been paid off*, then the FBI must act."

(Id. at ¶ 20).

The poster using the screen name "Laying Low" states:

- "Especially if you gin the system and steal money from seniors."

- To get around being terminated by the carriers, Cannella now runs all his business through Joann Small's contract.  This is HIGHLY deceptive and fraudulent.  THIS IS INSURANC FRAUD[.]"

- "The carriers are chosen by who pays the highest commissions. Not to mention that Cannella doesn't even employ ten people anymore. Everybody's left him, and those who remain have very little work to do during the day since so little insurance business is being written.  Now, Cannella is using Joann Small as a surrogate agent so it appears he is not involved in the sale.  This is HIGHLY UNETHICAL and FRAUDULENT!!!"

- "This guy is a con artist, through and through."

- "You're as corrupt now as you've ever been and this website is always going to be there to expose you and Small. You're nothing but a FRAUD, Cannella."

- "Cannella has purchased real estate along the Maryland shore in Joann Small's name to shield assets from (take your pick) the IRS."

- "Phil beat her senseless during an argument. Literally beat the holy $%#& out of her. She filed assault charges against him, which resulted in his arrest and the 10 day jail time verified on another posting here."

- "unscrupulous employers like Cannella from stealing money from agents. then Cannella refused to pay the agent anything at all.  Cannella's potential victims"

11

(Id. at ¶ 20).

The poster using the screen name "Guest Post" states:

- "I watched with great interest a CNBC show called "American Greed: Madoff Behind Bars." The parallels to Cannella's own psychopathic roller coaster ride are unmistakeable and chilling."

- "Cannella commits multiple counts of insurance fraud with each and every Navigator a client implements."

- "Fact: Cannella refuses to disclose that he's even selling annuities. Insurance fraud is the cornerstone of Cannella's illegal insurance scam. Cannella is a fraud. He commits insurance fraud every day."

- "Cannella Routinely Commits Felony Acting as Unregistered Investment Advisor: Where are You, PA Securities Commission?"

- "Been summarily terminated by nearly all top tier insurance carriers. Those taking the risk are the "av-visors' who work for Cannella and Small, for unlawful and deceptive sales practices and industry non-compliance – make a verbal complaint followed by email and/or letter."

- "simply explain that *due to their corruption*, Phil Cannella, Joann Small and First Senior Financial Group are not credible financial advisors for any senior. . . . Cannella's history of violence, criminal record, frivolous abuse of the legal system, use *of bribery and intimidation to coerce seniors, theft from seniors.*"

(Id. at ¶ 21).

Defendants' Website is not only filled with a massive amount of false statements about Plaintiffs, but it contains numerous statements making clear that the people behind it are competitors of FSFG attempting to use it to drive FSFG out of business. (Id. at ¶ 23). In fact, prior to Defendants' Website ever being launched, the owners of one of FSFG's competitors, American Tax and Advisory—and an eventual repeated poster on Defendants' Website—explicitly stated that the proposed website "is going to bring Phil down" and expressed pleasure in the fact that the website was going to knock FSFG out of business. (Id.). Then, subsequently on Defendants' Website, the screen name "Watchdog" states that the purpose of the website is:

12

"[To] get [Mr. Cannella] off the air and out of business." (Id.). The website further states that Watchdog "is up to his collar already trying to bring Cannealla down." (Id.).[3]

In addition to Watchdog's clear intent to put FSFG out of business, other Defendants have expressed the same intention.  For example, the defendant using the screen name "Guest Post" clearly makes his intentions known when he posts:

> I want you to know I'm doing everything I can to put you out of business. I've been working hard to get you terminated from as many insurance carriers as possible. I'm putting flyers on windshields at all your seminars. even stand out in the parking lot at all your events and warn people before they go inside. Most of them get back in their cars and drive away.

(Id. at ¶ 24).  Consistent with this statement, on multiple occasions, Plaintiffs have found flyers and stickers promoting Defendants' Website placed on the windshields of cars of individuals attending Plaintiffs' promotional events.  (Id.).

Defendants' Website even repeatedly encourages others to take affirmative steps to destroy FSFG's business.  Under the screen name "Note Taker," one Defendant "challenge[s] each and every person who has already made contact with the media to take time to CALL THE INSURANCE CARRIERS PHIL USES.  Cut off the source of money and you shut down Phil Cannella's enterprise."  (Id. at ¶25).  Likewise, another screen name "Industry Heavy," states that "[t]he best way I know to stop a predator like Phil is to cut off his source of income.  You do this by first poisoning and ending then his relationship with carriers.  Demand that both Phil's and First Senior's contracts be terminated immediately."  (Id.).  And another screen name "In the Know," encourages people to "go directly to the Pennsylvania insurance department and the labor and board and SIGN the complaints, he will be shut down."  (Id.).

---

[3]      Watchdog's intention to put Plaintiffs out of business is further evidenced by the fact that he disseminated similar false information to TV stations where Plaintiffs used to regularly appear with the purpose of influencing the TV stations to cancel Plaintiffs' programs.  (Id. at ¶23.)

Besides attempting to ruin FSFG, Defendants are using their website to advertise their own competitive businesses.  (Id. at ¶ 26).  For instance, the person(s) behind Defendants' Website repeatedly promotes the services of one of FSFG's competitors, Wealthguard Financial, and its owner Brian Powell.  (Id.).  On Defendants' Website, a person posting under the screen name "Annuity Watchdog"—which is the same pseudonym that Brian Powell uses on his website, the radio, and in other business areas—provides a "standing offer to anyone that wants a 'second opinion'" and tells the people to "contact the Watchdog here and he can direct you to me via email."  (Id.).  Three days later, a phone number "800 318 5344" was posted on Defendants' Website to Brian Powell's company Wealthguard Financial.  (Id.).  Watchdog then repeatedly promotes Mr. Powell, to wit: "**Brian [Powell] is financial service professional with a good reputation**, unlike Mr. Cannella."  (Id.).  The website promotes Mr. Powell in several other areas, including "Mr. Powell,  . . . he provides a sound plan, removes clients from risk and uses sound products."  (Id.).

Likewise, a person posting under the screen name "Izzy" has promoted another one of FSFG's competitors, stating that "Steve Cordasco is indeed a well-respected financial advisor and gentleman." (Id. at ¶ 26).  The website further states, "Cordasko [sic] is a highly educated, seasoned and thoroughly trained PROFESSIONAL financial planner . . . [n]ot some snake oil salesman like Phil." (Id.).

In short, the content of the statements on Defendants' Website makes clear that competitors are the individuals posting false information on the internet about FSFG to put it out of business, and regain some of the earnings they lost when FSFG's business increased during 2008-2010. (Id. at ¶ 28).

14

C.   **Plaintiffs Lose Millions of Dollars From The Defamatory Statements On Defendants' Website.**

Through their website, Defendants have caused enormous harm to FSFG and its owners. Since Defendants' Website is the first website listed on Google's results if you search "Phil Cannella," "FSFG" or "Crash Proof Retirement," it is the first information that anyone sees if they conduct any internet research on Plaintiffs or their products.  (Id. at ¶ 30).  Not surprisingly, this has substantially damaged Plaintiffs' ability to increase the business it provides to its current client base.  (Id.).  It has also caused Plaintiffs to have to spend enormous resources to attempt to mitigate its damages from the website.  (Id.).  And, it has caused employees, vendors, and TV shows to cancel their relationships with Plaintiffs.  (Id.).

Most importantly, however, Defendants' Website has dramatically reduced Plaintiffs' ability to generate new business.  Specifically, potential customers are now far less willing to meet with FSFG's insurance advisors based on what they read on Defendants' Website (Id.).  As one advisor said, "I have had several clients who had an appointment which they then cancelled … based off of what they had read on the 'The Truth About Cannella' website."  (Aff. Dougherty, at ¶ 3).[4]  Another FSFG advisor has "ha[d] at least 30 – 50 people in the last 18 months who have specifically brought up the existence of the website as a reason not to do business with us or cancel their second appointments because of it."  (Aff. Amadio, at ¶ 3).  Another advisor used to average 15 appointments a week prior to the existence of this website, and currently averages approximately 5 – 7 appointments.  (Aff. Rice, at ¶ 6).  Overall, while Plaintiffs have maintained, and even increased, their marketing or promotional activities, their

---

[4]      Attached hereto as Exhibit A is the Affidavit of Daniel Dougherty, along with the Affidavits of Susan Jungclaus, Nicholas L Yashim, Edward T. Rice, and Alexander Amadio.  All of these persons are insurance advisors for FSFG.

15

agents' sales of FSFG's products have dropped 40-50% since the inception of Defendants' Website. (FAC, at ¶ 30).

As a result, FSFG's earnings dropped significantly. In the year prior to the website's creation, FSFG earned approximately $9.75 million in revenue. (Id. at ¶ 31). Since the creation of the website in 2011, however, FSFG earned approximately $8.5 million in revenue for 2011 and is projected to earn approximately $7.1 million in revenue for 2012. (Id.). Thus, the website has caused FSFG to lose millions of dollars in revenues in two years.[5]

## III.   ARGUMENT

Fed. R. Civ. P. 26(d)(1) allows courts to authorize discovery before the Fed. R. Civ. P. 26(f) conference for the parties' convenience and in the interest of justice. Early discovery is "essential" in situations, such as here, because, "[w]ithout the ability to issue a subpoena, John Doe's true name would remain unknown, this suit would not proceed, and plaintiffs could receive no remedy." McMann v. Doe, 460 F. Supp. 2d 259 (D. Mass. 2006).

Early discovery is authorized when there is "good cause" to conduct such discovery. Fed. R. Civ. P. 26(d)(1); see also Leone v. Towanda Borough, 2012 U.S. Dist. LEXIS 47594 (M.D. Pa., April 4, 2012) (applying the less stringent "good cause" standard). Courts have repeatedly found "good cause" to conduct discovery prior to the Fed. R. Civ. P. 26(f) conference where such discovery is necessary to identify the defendants engaging in illegal conduct on the internet. For example, in Raw Films, Ltd. v. Does, 2012 U.S. Dist. LEXIS 41645, *15-16 (E.D. Pa. Mar. 23, 2012), the plaintiff moved for leave to serve discovery prior to a Rule 26(f) conference in order to identify anonymous defendants committing illegal conduct on the internet. "The Court found good cause for ordering that discovery, see Fed. R. Civ. P. 26(b)(1), because

---

[5]      Even one of the Defendants acknowledged that Defendants' Website has "very likely cost Cannella and FSFG anywhere from $3M to $5M in projected revenue." (Id.).

the plaintiff showed that a subpoena seeking the subscriber information associated with the allegedly infringing IP addresses would be the only way for the plaintiff to identify the proper defendants in this case and proceed with its claims against them." (Id.).   As this Court recognized, "the information sought is thus highly relevant to the plaintiff's claims." (Id.).

Similarly,  in McCluskey, 2010 U.S. Dist. LEXIS at *3-7, the Court  granted  Plaintiffs' motion to conduct discovery in advance of the Rule 26(f) conference for the purpose of discovering information needed to serve the individual Defendants who allegedly operated an internet ripoff scheme that falsely represent the existence of an "accredited" and "legitimate" high school. In AF Holdings LLC v. Doe, the district court recognized that Plaintiff will "have no other way to obtain this most basic information, Defendant's identity, without which the lawsuit cannot proceed."  2012 U.S. Dist. LEXIS 82690, *5-8 (N.D. Cal. June 14, 2012).  The Court further recognized that without leave to conduct expedited discovery, there exists a high risk that the ISP may destroy the information that Plaintiff seeks and thereby preclude Plaintiff from discovering Defendant's true identity."[6]

This case is directly analogous to each of the above cases as it is necessary for Plaintiffs to conduct discovery prior to the Rule 26(f) conference to identify the defendants and serve them with a copy of the Complaint.  In determining whether there is good cause to allow expedited discovery to identify anonymous internet users named as Doe defendants, it is generally considered whether: (A) the plaintiff can identify the missing party with sufficient specificity such that the court can determine that defendant(s) is a real person or entity who could be sued in

---

[6]     See also UMG Recordings, Inc. v. Doe, No. C-08-03999 RMW, 2008 U.S. Dist. LEXIS 79700, *2 (N.D. Cal. Sept. 4, 2008) ("Obviously, a plaintiff cannot have a discovery planning conference with an anonymous defendant.  It follows that the discovery the [plaintiffs] are entitled to conduct to identify the defendant must take place before the discovery planning conference because such information will permit the [plaintiffs] to identify John Doe and serve the defendant . . . .").

federal court; (B) the plaintiff identified previous steps taken to locate the elusive defendant(s); (C) the plaintiff's suit against defendant(s) could establish a prima facie case of defamation that can withstand summary judgment; and (D) the plaintiff has demonstrated that there is a reasonable likelihood of being able to identify the defendant through discovery such that service of process would be possible.  See, e.g., Incorp Services, Inc. v. Does 1-10, 2011 U.S. Dist. LEXIS 129848, *1 (N.D. Cal. Nov. 9, 2011).  Each of these elements is easily met in this case.

A.   **Plaintiffs Can Identify The Missing Parties With Sufficient Specificity.**

Plaintiffs can identify the Defendants in this case with specificity because their defamatory statements are attached to specific screen names.  Plaintiffs have identified on Exhibit C each of the screen names under which persons have made defamatory statements about Plaintiffs, and examples of the defamatory statements made under each name.  Pursuant to this Motion, Plaintiffs seek only discovery related to the identity of these specific individuals, and no other persons.  Because the defamatory statement(s) are attached to anonymous screen names under which the Defendants made false and defamatory statement(s), Plaintiffs can identify the missing parties with sufficient specificity.  See, e.g., Liberty Media Holdings, LLC v. Does, 2011 U.S. Dist. LEXIS 51526 (S.D. Cal. May 12, 2011) (finding plaintiff "sufficiently identified each John Doe defendant" as plaintiffs provided the "court with the unique IP addresses" attached to the defamatory statement).

B.   **Plaintiffs Have Taken Numerous Steps To Identify Defendants.**

Plaintiffs have taken multiple steps to attempt to identify the individuals posting false and defamatory information about Plaintiffs on Defendants' Website.  First, Plaintiffs attempted to contact "Watchdog" directly by e-mailing him at the only contact information available, WatchDog@truthaboutcannella.net and truthaboutcannella@yahoo.com.   (FAC, at ¶ 30).

18

Plaintiffs have also called the phone number listed on "Watchdog's" email, but have been unable to speak with anyone.  (Id.).  Plaintiffs requested that "Watchdog" cease and desist his illegal activities, but never received a response.  (Id.).  Plaintiffs retained Cyber Investigation Services ("CIS"), to see if they could identify any of the Defendants.  CIS's investigator, Bruce Anderson, attempted to identify the Defendants using technical metadata, internet log records, log file histories, and user agent details.  (Aff. Anderson, at ¶ 1).[7]  Mr. Anderson, however, was unsuccessful in identifying Defendants, since "Watchdog" had changed the Internet Service Provider ("ISP") hosting the website from one located in the United States to one located in Panama.  (Id. at ¶2).  "Watchdog" likely changed to a Panamanian ISP because Panamanian ISPs generally refuse to provide personal identification information attached to an IP address.  (Id.).

Based on the foregoing, Plaintiffs have taken more than sufficient attempts to identify Defendants.  20/20 Fin. Consulting, Inc., 2010 U.S. Dist. LEXIS 55343 (D. Colo., May 11, 2010) (allowing plaintiffs expedited discovery based, in part, on plaintiff's efforts to obtain the defendant's identities by contacting the operators of the various weblog and bulletin board websites); Directory Assistants, Inc. v. Doe, 2010 U.S. Dist. LEXIS 41881 (D. Conn., April 28, 2010) (recognizing plaintiff demonstrated good cause for granting its request for expedited discovery based upon plaintiff's "numerous attempts to discover the identity of the defendant," including contacting the operators of the various websites on which the defendant allegedly posts).

---

[7]    Attached hereto as Exhibit B is the Affidavit of Bruce Anderson.

**C.** **Plaintiffs' Claims Against Defendants Could Survive A Prima Facie Showing In Order To Defeat Summary Judgment.**

In order to demonstrate that Plaintiffs' right to seek redress outweighs the speakers' right to remain anonymous, the following factors must be established: (1) proper notification to the Defendants; (2) sufficient evidence to establish a prima facie case for all elements of a valid legal claim, within the Plaintiffs' control, such as would survive a motion for summary judgment; and (3) that the strength of Plaintiffs' prima facie case outweighs the Defendants' First Amendment rights.  See Pilchesky v. Gatelli, 2011 PA Super 3 (Superior Ct. Pa., 2009).

**1.** **Plaintiffs Will Ensure The Defendants Receive Notification Of Plaintiffs' Request For Expedited Discovery.**

Plaintiffs will take several different steps to provide Defendants notification of Plaintiffs' attempts to discover their identity prior to the production of such information.  Prior to or on the day of service, Plaintiffs will email copies of each of the subpoenas concerning the identity of "Watchdog" to the email addresses that "Watchdog" lists for himself on Defendants' Website, WatchDog@truthaboutcannella.net and truthaboutcannella@yahoo.com.  The Plaintiffs will also instruct the recipients of any of the subpoenas to notify the persons about whom the subpoenas request information, and to refrain from producing the information for 30 days to allow any of the Defendants time to file a motion to quash related to those subpoenas.  Further, Plaintiffs will email to the email addresses listed for "Watchdog" on Defendants' Website, copies of any of the deposition subpoenas and document subpoenas, and ask him to either post the subpoenas on Defendants' Website, or notify the individuals using the screen names whom Plaintiffs seek their identify.  Finally, Plaintiffs will instruct the individuals they seek to depose that prior to the deposition, they should notify any person that they know has posted information on Defendants'

20

Website under the screen names listed in Exhibit C,[8] to inform them that Plaintiffs have requested a deposition to determine their identity.

### 2. Plaintiffs Have Presented Sufficient Evidence For All Elements Of All Their Defamation Claims.

To establish a prima facie case of defamation, Plaintiffs have the burden of providing that: (1) the defamatory character of the communication; (2) its publication by the Defendants; (3) its application to the Plaintiff(s); (4) the understanding by the recipient of it as intended to be applied to the Plaintiff(s); (5) special harm resulting to the Plaintiff(s); and (6) abuse of a conditionally privileged occasion. 42 Pa. C.S. § 8343(a); see also ZS Assocs., Inc., 2011 U.S. Dist. LEXIS 5571. While Plaintiffs usually must plead a specific monetary loss to satisfy the "special harm" requirement, the requirement is eliminated if the words constitute defamation per se. Id.[9]

---

[8]        Attached hereto as Exhibit C is a list of some of the defamatory statements by Defendants.

[9]        In response to Plaintiffs' previous subpoena on Art Felderstein, John Doe argued that Mr. Cannella is a public figure. While Plaintiffs would certainly contest this assertion, it is irrelevant for purposes of this motion, or any motion to quash any subpoena to determine the identity of the Defendants in this case. Whether someone is a public figure is only relevant in defamation cases in that, in such situations, the plaintiff is required to show the defendant had malice to support his defamation claim. For purposes of deciding whether a plaintiff is entitled to discover the identity of an unknown defendant, however, Courts have held that a plaintiff does not need to present evidence of malice. For example, in John Doe No. 1 v. Cahill, the Delaware Supreme Court recognized that it was unreasonable to expect a plaintiff at this stage to prove actual malice where the plaintiff is a public official. 884 A.2d 451, 464 (Del. 2005). The court noted, "we are mindful that public figures in a defamation case must prove that the defendant made the statements with actual malice. Without discovery of the defendant's identity, satisfying this element may be difficult, if not impossible." Id. Thus, the court held that a public official plaintiff must establish, by prima facie evidence, "the elements of the claim that are within his control." Id. Because evidence of malice on the part of the Defendants is not within Plaintiffs' control, it is unnecessary here for Plaintiffs to present such evidence to discover the identity of the Defendants. Id. See also In re Does 1-10, 242 S.W.3d 805, 822 (Tex. App. Texarkana 2007) ("The actual malice requirement is an additional level of constitutional protection that applies only in particular circumstances for the imposition of liability, not discovery. A rule for identifying anonymous writers should be one of general application rather than one attempting to incorporate the special provision required for unusual situations. If an actual malice finding is required to impose liability, that will be determined at a later stage of the proceedings."); Solers, Inc. v. Doe, 977 A.2d 941, 958 (D.C. 2009) (noting that on remand, a key issue "will be determining what types of evidence the court reasonably may expect [Plaintiff] to proffer without knowing the identity of John Doe. Applying this aspect of the test will require sensitivity to the unique circumstances of each case. It may, for example, be difficult for [Plaintiff] to discern the defendant's motive -- and thus his state of mind -- without knowing his identity.").

Defamation per se can be either words imputing: criminal offense, loathsome disease, business misconduct, or serious sexual misconduct. See Cornell Cos., Inc. v. Borough of New Morgan, 512 F. Supp. 2d 238, 271 (E.D. Pa. 2007). More specifically, "[a] statement is defamatory per se an accusation of business misconduct if it 'ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for proper conduct of his lawful business.'" Synygy, Inc. v. Scott-Levin, Inc., 51 F. Supp. 2d 570, 580 (E.D. Pa. 1999) (quoting Clemente v. Espinosa, 749 Supp. 672, 677-78 (E.D. Pa. 1990)).

Defendants' statements clearly meet a prima facie showing of defamation. The statements satisfy the prima facie elements two, three, and four, as they are statements published by the Defendants that clearly relate to the Plaintiffs. The statements satisfy the prima facie elements one and six as the statements are not only defamatory, but are defamatory per se. As set forth above, the Defendants accuse Plaintiff Cannella of bribing state officials, which is not only false but defamatory per se. See Clemente, 749 F. Supp. at 679 (recognizing a statement "constitutes slander per se as an accusation of criminality when it charges either directly or indirectly the commission of a specific offense punishable by imprisonment."). Defendants accuse Plaintiff Cannella of stealing millions of dollars from advisors, customers, and senior citizens, which, again, are all false and defamatory per se. See id.; see also Tarquini v. Gorberg, 2010 U.S. Dist. LEXIS 93942, *13 (E.D. Pa., Sept., 9, 2010) ("Courts in Pennsylvania have generally held that accusations of theft are actionable as slander per se."). Defendants accuse Plaintiff Cannella of sexually abusing his employees, which is false and defamatory per se. Dempsey v. Bucknell Univ., 2012 U.S. Dist. LEXIS 62043, *46 (M.D. Pa., May 3, 2012) (recognizing "statements accus[ing] [p]laintiff ... of serious sexual misconduct ... implicat[e] the doctrine of slander per se, ... obviating the requirement that [p]laintiff allege special harm.").

22

Defendants accuse Plaintiff Cannella of being a mobster and the son of a mobster, which are false and defamatory per se. <u>Clemente</u>, 749 F. Supp. at 677 (finding that statements that an attorney was "connected with the Mafia" were linked to the attorney's honesty and integrity, and thus was slander per se on a business misconduct theory). Defendants accuse Plaintiff Small of engaging in sex to advance her career, which is false and defamatory per. <u>See, supra</u>, <u>Dempsey v. Bucknell Univ.</u>

Finally, to the extent that any of the false statements made by Defendants are simply defamation, and not defamation per se, they would still support a valid cause of action because, as discussed above, Plaintiffs have sustained economic losses from Defendants' conduct. Accordingly, Defendants' statements clearly meet the prima facie showing of defamation that would survive a motion for summary judgment.[10]

---

[10]    In addition to defamation claims, Plaintiffs also have evidence to meet the elements of their other claims against Defendants. For example, Plaintiffs have asserted claims for tortious interference with prospective contractual relations. To bring such a claim, a Plaintiff must establish that: (1) it had a prospective contractual relationship with a third party; (2) Defendant had a purpose or intent to harm Plaintiff by preventing the relationship from occurring; (3) the absence of privilege or justification with respect to Defendant's conduct; and (4) the occurrence of actual damage as a result of the conduct. <u>Advent Sys., Lt. v. Unisys Corp.</u>, 925 F.2d 670, 672 (3d Cir. 1991). Here, Defendants' statements make clear that they were aware of Plaintiffs' existing and potential business contracts, and that the primary purpose of their false statements was to influence clients to avoid entering into such contracts with Plaintiffs. <u>See e.g.</u>, FAC, at ¶ 12, 24. ("Watchdog" recognizing that the purpose of Defendants' Website is: "[To] get [Mr. Cannella] off the air and out of business."; Guest Post" stating, "I want you to know I'm doing everything I can to put you out of business.") Further, it is undisputed that Defendants' false statements have repeatedly caused existing clients to terminate their contracts, and prospective clients to refuse to enter into contracts with Plaintiffs. <u>See, e.g.</u>, Aff. Amadio, at ¶ 3 (discussing the more than 30 conversations had with customers in which they cite the statements on the website as the reason for not doing business with Plaintiffs); <u>see also</u> FAC, at ¶ 31. Plaintiffs can easily establish the elements of this tort against Defendants.

Plaintiffs also have valid claims against Defendants under § 43(a)(1)(B) of the Lanham Act for false advertising. Under this statute, Plaintiffs must establish: (1) the Defendants have made false or misleading statements as to Plaintiffs' product or services; (2) there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood or injury the Plaintiffs in terms of declining sales or loss of good will. <u>ZS Assocs., Inc. v. Synygy, Inc.</u>, 2011 U.S. Dist. LEXIS 55711, *7 (E.D. Pa. May 23, 2011). Here, Defendants have made an extraordinary number of false statements about FSFG's services and products, they are clearly likely to, and have influenced, customers' purchasing decisions, the speakers are competitors, and speakers have advertised their own products and services on the website. <u>See, supra</u>, § II.B. Under these facts, Plaintiffs have met the elements for Lanham Act claim.

23

### 3. The Harm Plaintiffs Have Suffered Outweighs Defendants' First Amendment Rights.

Courts have repeatedly held that where defendants defame the plaintiffs on the internet, the plaintiffs' right to seek a remedy for defendants' illegal conduct outweighs defendants' First Amendment rights.   This is because the "the First Amendment does not protect defamatory speech." John Doe No. 1 v. Cahill, 884 A.2d 451 (Del. 2005).  As such, Courts have recognized that there is a "distinction between using the internet to exchange ideas and opinions and using it as a cover to defame others." Cahill v. Doe, 879 A.2d 943, 956 (Del. Super. Ct. 2005).  In the latter case, "when a plaintiff can, in good faith, allege that a user has put the internet to use as a tool for defamation, the internet user will forfeit his right to anonymity in favor of the injured party's right to seek redress for the damage caused by the defamatory speech."  Id.  See also Immunomedics, Inc. v. Doe, 342 N.J. Super. 160, 167 (N.J. App. Div. 2001) ("Although anonymous speech on the Internet is protected, there must be an avenue for redress for those who are wronged.  Individuals choosing to harm another or violate an agreement through speech on the Internet cannot hope to shield their identity and avoid punishment through invocation of the First Amendment.").

In the present case, the Defendants' statements are extremely defamatory (rising to the level of defamatory per se),  and were made with the sole purpose of hurting the Plaintiffs' business, and were not based upon any type of privilege.  As a result, the Plaintiffs' right to enjoin the defamatory conduct and recover the appropriate damages far outweighs any First Amendment concerns.  See Pilchesky (recognizing that in "balancing the equities" the court should examine the "defamatory nature of the comments, the quantity and quality of the evidence presented, and whether the comments were privileged.").

24

This case is similar to a recent case where the Ninth Circuit affirmed the district court's order requiring the disclosure of the identities of anonymous online speakers who had engaged in a "smear campaign" via online defamatory statements about the plaintiffs.   See In re: Anonymous Online Speakers, 661 F.3d 1168, 1171 (9th Cir. 2011).   There, the plaintiffs sued one of their competitors claiming that the competitor had orchestrated a smear campaign against the plaintiffs.  Id. at 1172.  During discovery, the plaintiffs sought testimony of an employee who had knowledge of the identities of anonymous online speakers who allegedly posted defamatory comments about the plaintiffs.  Id.  The employee refused to identify the anonymous speakers on First Amendment grounds.  Id.  The district court ordered the employee to disclose the identity of three anonymous speakers, recognizing the "great potential for irresponsible, malicious, and harmful communication" and that particularly in the age of the Internet, the "speed and power of internet technology makes it difficult for the truth to 'catch up' to the lie."  Id. at 1176.  The Ninth Circuit affirmed the district court's decision to order the disclosure of the identity of the anonymous posters.  Id. at 1177.

Like the plaintiffs in In re: Anonymous Online Speakers, the Plaintiffs should be entitled to conduct discovery to identify the anonymous posters who have made defamatory statements about the Plaintiffs online.

**D.**      **Plaintiffs Have Demonstrated A Reasonable Likelihood Of Being Able To Identify Defendants Through Discovery Such That Service Of Process Would Be Possible.**

Because of the great lengths that "Watchdog" has gone to hide himself on the internet, the cyber investigator retained by Plaintiffs has recommended that Plaintiffs serve several different places with subpoenas to have a reasonable likelihood of identifying him.  Plaintiffs have three IP addresses that appear to be those of "Watchdog."  (Aff. Anderson, at ¶ 3).  Unless

25

"Watchdog" has created false IP addresses, subpoenas to ISPs that host the IP addresses should provide the name, address, telephone number and/or e-mail address attached to the IP address, as ISPs are required to obtain that information.  (Id.).  Comcast Cable Communications should have this information related to IP address 71.58.18.225, Autumn Networks should have this information related to IP address 66.197.138.183, and Allen & Goel Marketing Company should have this information related to IP address 74.205.83.130.  (Id.).

The cyber investigator has also identified several different websites that were created by "Watchdog," including:

- http://www.youtube.com/user/TruthAboutCannella;
- www.TruthaboutCannella.com;
- www.Truthaboutcannella.net;
- www.Twitter.com/cannellatruth;
- http://truthaboutcannellawordpres.com/2011/03/02/hello-world/;
- www.truthaboutcannella.net;
- http://www.squidoo.com/lensmasters/truthaboutcannella;
- http://www.facebook.com/pages/TruthAboutCannella.com;
- http://truthaboutcannella.tumblr.com; and
- http://en.gravatar.com/truthaboutcannella
- http://www.insurance-forums.net/forum/

(Id. at ¶ 4).

The ISPs hosting "Watchdog's" websites generally have personal identifying information for persons who create such websites, such as IP addresses.  (Id.).  Thus, subpoenas to those ISPs should reveal, at minimum, additional IP addresses of "Watchdog."  Once Plaintiffs obtain those additional IP addresses, subpoenas to the ISPs that host the IP addresses should provide the name, address, telephone number and/or e-mail address attached to those IP addresses.  (Id.).  With the subpoenas related to the IP addresses pertaining to "Watchdog" that we already have, and these additional subpoenas, there is a reasonable likelihood that we should be able to identify Watchdog.  (Id.).  See, e.g., Liberty Media Holdings, LLC v. Does, 2011 U.S. Dist. LEXIS

51526, *6 (S.D. Cal. May 12, 2011) (finding plaintiff "sufficiently identified each John Doe defendant" as plaintiffs provided the "court with the unique IP addresses and names of the ISPs and/or cable operators that provided internet access for the users of the identified IP addresses.").

Because the above subpoenas will not identify the persons who made defamatory statements under any screen names other than "Watchdog," (e.g., "Annuity Watchdog," "In the Know," etc.), and because there is a chance that even those subpoenas could fail to identify "Watchdog," Plaintiffs also need to depose three individuals to have a strong likelihood of obtaining the identity of each of the Defendants.

First, Plaintiffs seek leave to depose Brian Powell because there is a substantial amount of evidence that suggests Mr. Powell knows the identity of the Defendants. In fact, based on information posted on the website, there is a strong likelihood that Mr. Powell posted each of the defamatory comments listed under the screen names "Annuity Watchdog" and "In the Know." (As set forth in Exhibit C, "Annuity Watchdog" and "In the Know" have repeatedly made false and defamatory statements about Plaintiffs). Posters on Defendants' Website explicitly state that Mr. Powell is the individual making comments under the screen name "In the Know." (FAC, at ¶ 27). For example, in response to a comment from "In the Know," one commenter refers to "In the Know" as "Mr. Powell." (Id.). In another comment, Watchdog responds to "In the Know," with the statement: "I think u hit the nail on the head 'Brian'." (Id.). In another comment, a commenter responds to "In the Know" by stating, "Brian – Great advice and info, thanks so much for providing it." (Id.).

There is also strong evidence that Mr. Powell made each of the false statements listed under the screen name "Annuity Watchdog." "Annuity Watchdog" has posted the following identifying information: "I was on WWDB for 6 years as the Annuity Watchdog"; "I sell

27

annuities and I sell Life Insurance"; and "I am in the insurance Industry." (Id.). Mr. Powell squarely meets this description. Mr. Powell had a radio show on WWDB for six years in which he referred to himself as "Annuity Watchdog," and he is in the insurance industry selling annuities and life insurance. (Id.).

There is also a strong likelihood that Mr. Powell knows the identity of the person making the statements under the screen name "Watchdog." As discussed above, "Watchdog" repeatedly promotes Mr. Powell, to wit: "To Mr. Brian Powell I offer my sincerest apology. **Brian is financial service professional with a good reputation**, unlike Mr. Cannella." (Id.). There is also a statement under the screen name "Annuity Watchdog"—which is ostensibly Mr. Powell— that tells the people to "**contact the Watchdog here and he can direct you to me via email**." (Id.). Then, three days later after this comment, a phone number "800 318 5344" appeared on the website, which is the phone number of Mr. Powell's company Wealthguard Financial. (Id.). While these postings provide extremely strong evidence that Mr. Powell communicates with "Watchdog," and is fully aware of his identity, it is also worth noting that Mr. Powell has as a strong motive to defame FSFG since his company is a direct competitor of FSFG, and he was an adverse party to FSFG in prior litigation. (Id.).

Based on Plaintiffs' investigation, there is also a strong likelihood that they can discover information related to the identity of individuals behind the false statements in Exhibit C through document subpoenas and depositions of two additional persons, Steve Suib and Arthur Felderstein. According to the deposition testimony of one of Mr. Suib's current employees in another case, Mr. Suib has posted more than 20 comments on Defendants' Website about Plaintiffs, he was aware of the website before it actually appeared, and Mr. Suib stated that the website was "going to bring Phil down" and that this gave him pleasure. (See excerpts from

Louis Aarons Deposition, at pp. 139 - 158).[11]   Additionally, on multiple occasions, Watchdog has advertised for Steve Suib's company, American Tax and Advisory Corporation, claiming they are a "real design team", and "there are always good ones out there" and then providing a link to Mr. Suib's company.  (FAC, at ¶ 26).  Since Mr. Suib is a competitor of FSFG's, and has historically harassed FSFG, it is not surprising that he is affiliated with Defendants' Website and knows the identity of the Defendants in this case.

Finally, according to Mr. Suib's employee, Mr. Suib communicated with Mr. Felderstein, (another one of FSFG's former associates and CPA for Mr Cannella), on a repeated basis about Defendants' Website.  During these communications, Mr. Felderstein stated that he "has it in for Phil," and he expressed pleasure that Defendants' Website was going to bring down Plaintiffs' business.  (See id., at pg 147-148, 152, 157-158).  Mr. Felderstein has even admitted on the radio that he sent a "mole" into Plaintiffs' business to obtain inside information about the business. (Id.) Additionally, Mr. Felderstein has objected to the production of any documents or information relating to the identity of the Defendants in this case.  See Mr. Felderstein's Motion to Quash, Doc. # 2, Filed 6/22/12.  Based upon this evidence, and Mr. Felderstein's repeated communications with Mr. Suib about Defendants' Website, it is reasonably likely that Mr. Felderstein will have knowledge related to the identity of the persons making false statements about Plaintiffs on Defendants' Website.

## IV.   **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the attached Proposed Order and grant Plaintiffs' leave to serve the document and deposition subpoenas as set forth in the Proposed Order, subject to the conditions stated therein.

---

[11]       Attached hereto as Exhibit D are excerpts from Louis Aarons Deposition, pgs., 147-148, 152, 157-158.

_____
Neil E. Jokelson
NEIL E. JOKELSON & ASSOCIATES
230 S. Broad St # 8
Philadelphia, PA 19102
(215) 735-7556

Whitney C. Gibson, *Admitted Pro Hac Vice*
(OH Bar No. 0077961)
VORYS, SATER, SEYMOUR & PEASE, LLP
301 East Fourth Street, Suite 3500
Great American Tower
Cincinnati, OH  45202
(513) 723-4000
(513) 852-7825  (Facsimile)

30