## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
FIRST SENIOR FINANCIAL GROUP  :
LLC, PHILLIP J. CANNELLA, III :
AND JOANN SMALL,              :
                             :
            Plaintiffs,       :   CIVIL ACTION
                             :
    v.                        :   NO. 12-cv-1247
                             :
"WATCHDOG," AND JOHN DOE      :
DEFENDANTS 1-9,               :
                             :
            Defendants.       :
```

### MEMORANDUM AND ORDER

**JOYNER, J.**                                    **APRIL    3, 2014**

Before the Court are Plaintiff's Motion for Sanctions Based on Defendant Watchdog's Spoliation of Evidence (Doc. No. 134) and Defendant Watchdog's Response in Opposition thereto (Doc. No. 138); Plaintiffs' (Doc. No. 153) and Defendant Watchdog's (Doc. No. 154) Supplemental Briefs; as well as Defendant's Response to Plaintiffs' Supplemental Brief (Doc. No. 158). For the following reasons, it is hereby ORDERED that the Motion for Sanctions is GRANTED in part and DENIED in part. An Order follows.

**II.   BACKGROUND**

Defendant Krista Brennan ("Brennan") is the creator of websites, including truthaboutcannella.com and truthaboutcannella.net, which contain information portraying the business and ethical practices of Plaintiffs First Senior

1

Financial Group LLC, Phillip J. Cannella III, and Joann Small in a severely negative light. Brennan, or "Watchdog" as she refers to herself on these websites, insists that the information on her sites is true. Plaintiffs, however, argue that it is disparaging and defamatory.

Brennan's educational background consists of bachelor's degrees in communication studies and business, a master's degree in organizational and industrial psychology, and significant credits toward a master of science in information science focusing on the management of information technology. (Tr. 155-6). She has held jobs for which she acquired domain names for clients and designed websites for them. (Tr. 157). Among other positions she has held, Brennan worked for 4 years as the Director of Technology for the Vanguard Charitable Endowment Program, and worked as a Senior Executive at Stellar Financial, Inc., where she was responsible for management of the company's financial software product, software development, and technology operations, among other things. (Pl. Ex. L, Resume of Krista Cantrell Brennan). Although she knows how to install most kinds of software, Brennan asserts that she does not know how to install an operating system on a computer. (Tr. 156). Brennan once applied for a position as Chief Operating Officer with Plaintiff First Senior Financial Group prior to the commencement of litigation, but was not given an offer of employment. (Tr.

157-8, 160.) At present, Brennan has a diagnosis of an advanced form of secondary progressive multiple sclerosis ("MS") with associated loss of sensory ability and mobility, which impedes her ability to walk, read, or type; she also suffers from nystagmus, which makes it difficult for her to read or use a computer. (Tr. 166-67).

In March 2012, Plaintiffs commenced suit in this Court alleging defamation, tortious interference with business relationships, civil conspiracy, and violations of the Lanham Act. See (First Amended Complaint, Doc. No. 9). In August 2012, the Court granted Plaintiff's Motion for Alternative Service, allowing service by e-mail upon Defendant Watchdog. (Order of August 29, 2012, Doc. No. 17). Default Judgment for failure to appear, plead, or otherwise defend the action was entered against Watchdog in November 2012. (Doc. No. 56). Brennan maintains that she did not learn of the lawsuit until December 2012. (Def. Resp. Ex. A ¶ 3).

In February 2013, Brennan first appeared in the present action by filing a Motion to Vacate the Default Judgment that had been entered against her. (Doc. No. 82). The Court scheduled an evidentiary hearing to determine whether Brennan had received notice of the action and whether service had been effectuated by e-mail. (Doc. No. 89). On June 13, 2013, the Court ordered the Defendant to:

> [I]dentify any and all electronic
> devices from which she accessed her email
> accounts truthaboutcannella@yahoo.com and
> watchdog@truthaboutcannella.net and any
> documents or records related to the website
> truthaboutcannella.net. Defendant Watchdog
> shall then submit these devices and computers
> for a forensic examination. Defendant
> Watchdog may select the expert used for the
> forensic examination, and the Plaintiffs
> shall pay for the forensic examination. (Doc.
> No. 97 ¶ 1).

On June 25, Brennan identified the computer of her mother Rose Ann Cantrell (the "target computer") to be the only readily-identifiable and accessible computer from which she accessed these email accounts.[1] (Defendant Watchdog's Identification of Computers, Pl. Ex. D). Plaintiffs' counsel did not respond to Brennan's identification of computers at that time. (Doc. No. 112-1 at ¶¶ 13-15).

The target computer at Ms. Cantrell's residence, 160 Whispering Oaks Drive in West Chester, PA, was always located in the kitchen area. (Tr. 31, 70, 153). Ms. Cantrell used the target computer on a daily basis to check her bank statements. (Tr. 35, 70, 154). While living with her mother, Brennan had frequent and easy access to the target computer as well. (Tr. 154). At the time, she lived on the ground floor of the house, the same floor

---

[1] Brennan also identified several other computers, including computers owned by Immaculata University, a computer she sold at a yard sale in April 2012, computers belonging to personal friends, a laptop she borrowed from a man in Texas, a computer belonging to Steve Watts in Texas, a computer belonging to stranger in Panera Bread, and publicly-available computers at a K-Mart store. (Pl. Ex. D). None of these are accessible at present.

where the computer was located. Id. On two occasions with unknown dates, Ms. Cantrell asked individual contractors to make repairs to her computer; she also asked her son-in-law, David Borda, to help her access her email at times. (Tr. 41-44). Brennan was not always at Ms. Cantrell's house while she was living there; she took three trips away of approximately 4-6 weeks, including in the summer of 2012 and the winter of 2012-2013. (Tr. 185).

On June 28, 2013, Brennan moved out of her mother's house in West Chester and flew to Texas. (Tr. 188; Def. Ex. A-2). She did not alert her counsel to the fact that she was leaving Pennsylvania. (Tr. 176). Two Facebook posts on June 28 and 29 indicated her location as Houston, Texas. (Pl. Ex. 3,4).

On July 1, Plaintiff's newly-appointed counsel contacted Brennan's counsel to discuss the status of the forensic examination, and Brennan's counsel reminded him of the previous identification of computers. (Doc. No. 112-1 at ¶ 15-16).

On July 3, 2013, counsel for the parties conducted a telephone conference outside of the Court's presence. Counsel for Brennan, Mr. Cohen, suggested the retention of IT Acceleration ("ITA"), a local IT firm, to complete the forensic examination. (Affidavit of Sidney S. Liebesman, Pl. Ex. F at ¶ 5). Brennan's counsel also suggested that a device called "EZ Imager" be used. Id. ¶ 6; Tr. 175. This device could be used by sending a USB drive with imaging software to the house of Ms. Cantrell, where

it could be connected to the target computer, directed to run the imaging software, and then returned to ITA. (Tr. 83-86, 112-113, 186-7). While counsel for Plaintiffs affirms that Brennan's counsel suggested that EZ Imager be used by Brennan without Ms. Cantrell's knowledge, (Liebesman Aff. ¶ 6), Brennan testified that she had understood that an ITA employee would use the device (Tr. 175-76). Brennan preferred the EZ Imager method of submitting to forensic examination because Ms. Cantrell vehemently opposed the release of her computer to the custody of forensic examiners. (Tr. 187). Counsel for Plaintiffs strongly opposed the use of EZ Imager, citing concerns for Ms. Cantrell's privacy interests if the exam were completed without her knowledge and a desire to observe strict compliance with the Court order requiring that the target computer itself be produced to a forensic examiner. (Liebesman Aff. ¶ 7). In the expert opinion of Gary Hunt, a Forensic Analyst at ITA, the use of EZ Imager is a typical, authenticated practice which is forensically equivalent to having a technician examine a hard drive in person. (Tr. 86, 113).

On July 7, 2013, Ms. Cantrell "checked in" on Facebook at a Starbucks; her location was posted as Katy, Texas. (Def. Ex. A-5).

In early August 2013, Ms. Cantrell was hospitalized after suffering a heart attack. (Def. Ex. E). When Plaintiffs sought to

subpoena Ms. Cantrell to produce the target computer (Doc. No. 107), Brennan objected and requested that the Court vacate its June 13, 2013 Order. See (Doc. No. 112). On August 6, the Court ordered that Rose Ann Cantrell's computer be produced for forensic examination. (Doc. No. 115). When the computer was still not delivered, the Court verbally reiterated its order in an August 20 conference call with the parties. (Doc. No. 119). The computer was produced to ITA the next day by David Borda, Ms. Cantrell's son-in-law. (Tr. 69-70). It was the results of this forensic examination which led Plaintiffs to file the present Motion for Sanctions Based Upon Spoliation of Evidence.

Gary Hunt, the ITA Forensic Analyst, obtained a mirror image of the target computer, returned the target computer to Ms. Cantrell, and then performed a forensic examination of the mirror image. (Declaration of Gary Hunt, Pl. Ex. K at ¶ 2-3). He found no user-created documents on the computer. Id. ¶ 8. He also discovered that on July 7, 2013, Windows 7 had been reinstalled on the computer. Id. ¶ 9. The only current user profile on the target computer, "roseanncantrell," was created at the same time. Id. ¶ 10. It was not possible to determine who had completed the reinstallation, nor who was logged on to the computer prior to the reinstallation. Id. ¶ 11; (Tr. 97-98, 120). Mr. Hunt also concluded that two different types of data-wiping software, Tracks Eraser Pro and CCleaner, had been installed and used on

the target computer. (Hunt Decl. ¶ 12). Though it is not possible to determine when exactly these two types of software were used, they were used prior to July 7, 2013 by the user profile "Rose" which no longer resides on the computer. Id. ¶ 12-13, 16. It was also not possible for Mr. Hunt to determine who had employed these two types of software, and what, if any, data was deleted. In addition to their data-wiping capabilities, Tracks Eraser Pro and CCleaner have functions related to system optimization. Id. ¶ 14. While CCleaner is sometimes pre-installed on computers, Tracks Eraser Pro must typically be installed on a computer after it is purchased. (Tr. 93). Mr. Hunt testified that the use of both programs on one computer is "fairly rare" in his experience. (Tr. 131-32).

Lastly, Mr. Hunt conducted searches for certain keywords provided to him by counsel for the parties. Nearly all of the Plaintiffs' search terms hit on words in the target computer. (Pl. Ex. I). The search term hits were either system-related files or fragments from the unallocated space, which is disk space not being used by active files which can be over-written by the computer. (Hunt Decl. ¶ 8). Files or fragments are moved to a computer's unallocated space when files are deleted. (Tr. 126). Additionally, fragments may end up in the unallocated space as a result of clearing one's browser history or having temporary files running on the computer. Id. Mr. Hunt advised counsel that,

8

at times, some keyword searches may result in "false positive" hits. (Tr. 117-118). For example, a positive hit for the word "complaint" may not refer to a complaint in a legal action. (Tr. 118). However, uncommon words such as "metaphysicalgrrl" and "Watchdog" are less likely to produce false positives. (Tr. 137).

On January 27, 2014, Plaintiffs withdrew their opposition to Brennan's Motion to Vacate Default Judgment. See (Doc. No. 146). The Court subsequently vacated the default. (Doc. No 147).

The Court held an evidentiary hearing on Plaintiff's Motion for Sanctions Based on Defendant Watchdog's Spoliation of Evidence on February 18, 2014. The Court heard testimony from Rose Ann Cantrell, David Borda, Krista Brennan, and Gary Hunt.

## III. ANALYSIS

Spoliation usually refers to the alteration or destruction of evidence. Bull v. United Parcel Serv., 665 F.3d 68, 73 (3d Cir. 2012). However, "the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party that has prevented production did so out of the well-founded fear that the contents would harm him." Id. (citing Gumbs v. International Harvester, Inc., 718 F.2d 88, 96 (3d Cir. 1983)). Thus, because a party's failure to produce a document can have the same practical effect as destroying it, failure to produce evidence can, in certain circumstances, be characterized as spoliation. Id.

Spoliation occurs when (a) the evidence was in the party's control, (b) the evidence is relevant to the claims or defenses in the case, (c) there has been actual suppression or witholding of evidence, and (d) the duty to preserve the evidence was reasonably foreseeable to the party. <u>Id</u>. (citing <u>Brewer v. Quaker State Oil Ref. Corp.</u>, 72 F.3d 326, 334 (3d Cir. 1995)). The party asserting that spoliation of evidence has taken place carries the burden of proof. Stream Cos., Inc. v. Windward Adver., 2013 WL 376121 at *2 (E.D. Pa. 2013); Tabon v. University of Pennsylvania <u>Health System</u>, 10-cv-2781, 2012 WL 2953216 at *2 (E.D. Pa. 2012).

The Court concludes that these factors are met in the present case, and imposes appropriate sanctions.

**A.   Control**

To succeed on its motion, Plaintiffs must prove that Brennan had control over the target computer. Whether the alleged spoliator's control is exclusive is considered in the spoliation analysis. <u>See, e.g.</u>, <u>Patel v. Havana Bar, Rest. & Catering</u>, 2011 WL 6029983 at *9 (E.D. Pa. Dec. 5, 2011); <u>Kvitka v. Puffin Co., LLC</u>, 2009 WL 385582 at *7 (M.D. Pa. Feb. 13, 2009). However, exclusivity is not necessary for a finding of control. Indeed, courts have found that control may exist even if a third party physically possesses the evidence at issue. <u>See, e.g.</u>, <u>Klett v. Green</u>, 3:10-cv-02091, 2012 WL 2476368 (D. N.J. June 27, 2012); <u>Haskins v. First American Title Ins. Co.</u>, Civ. 10-5044, 2012 WL

5183908 at *5 (D.N.J. Oct. 18, 2012)("documents may be within [defendant's] control even if it does not have physical possession of the documents."); Pennsylvania Trust Co. v. Dorel Juvenile Grp., Inc., Civ.A. 07-4029, 2011 WL 2789336 (E.D. Pa. July 18, 2011); Indem. Ins. Co. Of N. Am. v. Electrolux Home Products, Inc., Civ.A. 10-4113, 2011 WL 6099362 (E.D. Pa. Dec. 7, 2011), aff'd 520 Fed. App'x 107 (3d Cir. 2013); Centimark Corp. v. Pegnato & Pegnato Roof Mgmt., Inc., Civ. A. 05-708, 2008 WL 1995305 (W.D. Pa. May 6, 2008).

Defendant Brennan argues that the target computer was frequently outside of Brennan's exclusive control, that it belonged to her mother, and that Brennan was frequently away from the computer on trips taken out of state. Brennan also avers that "Ms. Cantrell, other family members, and even an independent contractor accessed the Target Computer at various times." (Def. Response at 18). Critically, Brennan argues that "[w]hatever non-exclusive control Watchdog exercised over the Target Computer departed entirely as she departed her mother's house on June 28, 2013" to go to Houston, Texas. Id. Plaintiffs respond that Brennan lived in the house with the computer, had easy access to it, and in fact proposed on July 3, 2013, to opposing counsel that she could perform the mirror imaging of the computer using EZ Imager without Ms. Cantrell's knowledge. (Pl. Motion at 15).

Based on testimony adduced at the evidentiary hearing, the

Court credits Ms. Cantrell's testimony that the computer was used almost exclusively, with very few exceptions, by Ms. Cantrell and by Brennan. The Court gives more weight to Ms. Cantrell's in-person testimony, which was adamant on this point, than to her declaration stating that guests to Ms. Cantrell's home frequently used the computer as well.[2] See (Tr. 41-42, 59-60). The Court also finds that this testimony accords with that of Brennan, who testified that she resided on the first floor of her mother's home, on the same floor as the computer, and was able to use the computer without restrictions. (Tr. 154). However, Brennan was not always at home when she lived with her mother. (Tr. 185). The Court also finds that, on July 3, 2013, four days before Windows was reinstalled on the target computer, Defendant Watchdog's counsel suggested to Plaintiffs' counsel that Brennan use EZ Imager to obtain an image of the target computer herself. See (Pl. Suppl. Brief, Doc. No. 153, at Ex. B).

The Court further finds that Brennan took a plane to Texas on June 28, 2013, (Tr. 188; Def. Ex. A-2),[3] and that her Facebook

---

[2] In fact, Ms. Cantrell testified that she did not read her Declaration before signing it, despite her counsel's urging to do so. She signed the Declaration because she believed that if she did so "everything would be okay" regarding the litigation. (Tr. 60). Though the Court finds Ms. Cantrell's testimony on the whole to display some lapses in memory, especially about the dates of certain events, her testimony regarding who used the computer was clear, consistent, and resolute.

[3] The Court gives less weight to Watchdog's testimony that she was in Texas continuously from June 28, 2013 until the day before the hearing, for the following reasons. First, the Court has been presented with Watchdog's plane ticket to Texas but not copies of ticket(s) back to Philadelphia. Second, Watchdog's counsel suggested to opposing counsel on July 3rd that Brennan could herself obtain a mirror image of the target computer using EZ

posts on June 28, June 29, and July 7 indicated her location as
Texas. (Pl. Ex. A-3, A-4, A-5).

After reviewing the evidence before it, the Court finds that
the target computer was sufficiently within Brennan's control to
meet the first element of the spoliation test. While she lived at
her mother's house, Brennan unquestionably had sufficient
physical access to and unfettered use of the computer to exercise
control over it.

Further, Brennan's legal control of the target computer was
not dissolved by her decision to depart for Texas. Lack of
physical possession does not necessarily negate a party's control
over evidence. In Indem. Ins. Co. of N. Am. v. Electrolux Home
Products, Inc., Civ. A. 10-4113, 2011 WL 6099362 (E.D. Pa. Dec.
7, 2011), the Plaintiff's experts assessed fire damage after a
fire had occurred in a school. Id. at *2. The experts preserved
some evidence, but left behind a small metal can on the scene.
Id. at *5. Later, the can was lost by the school, which was
repairing the fire-damaged area. Id. at *3. The district court
reasoned that "[t]he evidence here was within Plaintiff's

---

Imager. Third, the Court found Watchdog's testimony on the whole to be less
credible than that of other witnesses due to her bias and admission that she
represents to her web followers that her MS medicine costs over $60,000 per
year but makes no mention of the fact that she pays only $260 out of pocket
(Tr. 180-81). Additionally, Brennan's facebook posts that "[t]hese particular
lawyers, attorneys, are very harassing. They are stupid too. I'm way smarter
than these people" (Tr. 183) evidence a certain disregard for the seriousness
of the claims against her.
        However, as explained in further detail below, Brennan's physical
location on the date of July 7, 2013, is not a dispositive factor in the
Court's analysis of her legal control of the target computer.

control. It is true that the School District, not Plaintiff, was
responsible for the school grounds. Nevertheless . . .
Plaintiff's experts had the authority and ability to control
potential evidence and remove it from the scene of the fire." Id.
at *8. In affirming the district court, the Third Circuit
explained that "despite the fact that the experts should have
known that the metal can and its contents would be discoverable
and likely destroyed if not preserved at that time, they decided
not to preserve the metal can . . . Therefore, the District Court
did not abuse its discretion in determining that spoliation
occurred." 520 Fed. App'x 107, 111 (3d Cir. 2013). Thus, the
district court and the Third Circuit agreed that the Plaintiffs'
legal control over the metal can did not conclude when Plaintiffs
relinquished physical control of it.

Likewise, in Klett v. Green, 3:10-cv-02091, 2012 WL 2476368
(D.N.J. June 27, 2012), the Plaintiff's car was impounded by New
Jersey State Police after an accident. Id. at *10. It was later
destroyed while outside of Plaintiff's physical possession. Id.
at *9. The Court held that, even though the vehicle was impounded
and not at plaintiff's house, "there is no evidence that
Plaintiff relinquished ownership, and thus control, of the
vehicle prior to filing suit . . . As a result, the vehicle was
under Plaintiff's control, insofar as she had access to and
ownership of it." Id. (citing Zaloga v. Borough of Moosic, No.

14

3:10-cv-2604, 2012 WL 1899665 at *2 (M.D. Pa. 2012)("Control is defined as the legal right to obtain the documents required on demand.")) As in Indem. Ins. Co. of N. Am., the court in Klett found that ownership of, access to, and responsibility for an item determined control, not physical possession.

Similarly here, Brennan's unfettered access to, use of, and responsibility for the target computer define her control. Though Ms. Cantrell, not Brennan, was the ultimate owner of the target computer, Brennan was made responsible by court order for turning over the target computer for a forensic exam and had at her disposal the means of doing so, or could have petitioned the Court for assistance. Brennan's voluntary relinquishment of physical access to the target computer does not allow her to argue that she did not have legal control when the computer's reinstallation of Windows 7 occurred.

In sum, the Court concludes that Brennan had control of the evidence at issue, the information on the target computer.

**B.   Relevance to Claims or Defenses**

At the time that the reinstallation of Windows 7 occurred on July 7, 2013, at least some of the documents or files on the target computer were unequivocally relevant to the present suit. By that time, Brennan had admitted to using the target computer in connection with the websites central to the present case. (Third Declaration of Krista Brennan, Pl. Ex. B). Unlike the

15

other computers Brennan used in connection with her websites, the target computer was the only one to which she still had access during the summer of 2013, further increasing its standing in this case. See id. Moreover, Brennan argued in her pending Motion to Vacate Default Judgment (Doc. No. 82) that she never received e-mail service of the First Amended Complaint and Summons. By raising this defense to default judgment, Brennan reinforced the relevancy of the information on the target computer, including any emails, files, or other data regarding the lawsuit.

Though Brennan's counsel argued during the evidentiary hearing that any relevance to the Motion to Vacate Default Judgment was mooted by the Plaintiffs' withdrawal of their opposition to this motion, the spoliation inquiry must focus on the claims and defenses in the case at the time of spoliation, not at this later date.

The fragments of data found in the unallocated space of the target computer further bolster the Court's conclusion that it contained relevant evidence. Prior to the forensic examination, counsel for the parties provided 59 search terms to Mr. Hunt. (Tr. 87). The search terms returned numerous hits, including 196 hits for "Cannella," 13 hits for "Metaphysicalgrrl," and 2,749 hits for "Watchdog," (Pl. Ex. I), terms unlikely to produce false positive hits. (Tr. 136-37). Though these terms may have appeared on the computer as a result of filings associated with

16

the present litigation, these hits are nonetheless strongly suggestive of the presence of relevant evidence. Moreover, during the evidentiary hearing, counsel for Plaintiffs demonstrated that ITA found in the unallocated space of the target computer a paragraph mentioning Mr. Cannella which contained the same exact language, word-for-word, as a posting that later appeared on truthaboutcannella.com. (Tr. 198-202). This longer fragment, even more so than the hits for search terms conducted by ITA, demonstrates that the hard drive of the computer did contain relevant evidence. At minimum, it shows that Brennan accessed the truthaboutcannella.com website from the computer, and later cleared her browser history, moving the language into the unallocated space. In either case, it is highly likely that the information stored on the target computer was relevant to claims or defenses of the parties.

The Court finds that the second element of the spoliation test is met.

## C.   Actual Suppression or Withholding

The party asserting spoliation must prove that evidence was actually suppressed or withheld. See Bull, 665 F.3d at 77. The Third Circuit has recently clarified that "[a] finding of bad faith is pivotal to a spoliation determination." Id. at 79. Ordinary negligence does not suffice to establish spoliation. Bozic v. City of Washington, Pa., 912 F.Supp.2d 257, 270 (W.D.

Pa. 2012)(collecting cases). The party asserting spoliation must prove that evidence was intentionally withheld, altered, or destroyed. <u>Bull</u>, 665 F.3d at 79. Thus, no unfavorable inference of spoliation arises if the evidence was lost, accidentally destroyed, or where the failure to produce it is otherwise properly accounted for. <u>Id</u>. (citing <u>Brewer</u>, 72 F.3d at 334).

After the Third Circuit's decision in <u>Bull</u>, courts within this Circuit have sought to distinguish conduct constituting bad faith from conduct equivalent to mere accidental destruction or loss of evidence. <u>See</u> <u>Bozic v. City of Washington, Pa.</u>, 912 F. Supp. 257, 269 (W.D. Pa. 2012)("[w]hat remains to be determined after <u>Bull</u> is the requisite mental state or level of scienter for <u>Bull</u> "bad faith" . . . .). Typically, the destruction of evidence by an automated system pursuant to an even-handed policy, such as the re-recording of videotapes in the usual course of business, does not constitute bad faith. <u>See</u>, <u>e.g.</u>, <u>U.S. v. Nelson</u>, 481 Fed. Appx. 40, 42 (3d Cir. 2012). In these situations, the lack of bad faith stems in part from the fact that the party controlling the evidence had no reason to believe that it would be required in litigation. <u>See</u>, <u>e.g.</u>, <u>id</u>; <u>McCann v. Kennedy University Hosp., Inc.</u>, Civ. 12-1535, 2014 WL 282693 at *7 (D.N.J. Jan. 24, 2014)("the Court finds that prior to the videotapes being taped over, it was not 'objectively foreseeable' to defendant that the videotapes from the emergency room lobby

were relevant to plaintiff's claim . . ."); <u>Tabon v. University of Pennsylvania Health System</u>, 10-cv-2781, 2012 WL 2953216 at *4-5 (E.D. Pa. July 20, 2012)(defendants destroyed records as part of routine protocol, prior to the records being requested by plaintiff); <u>Heck v. Memorial Health Systems</u>, 1:10-cv-1675, 2012 WL 3597175 at *2 (M.D. Pa. Aug. 20, 2012). Similarly, imperfect measures that fail to preserve some evidence from destruction by an automated system do not establish bad faith if active efforts were made to preserve other evidence. See <u>Victor v. Lawler</u>, 3:08-cv-1374, 2012 WL 1642603 at *105-6 (M.D. Pa. May 10, 2012), <u>aff'd</u>, 520 Fed. Appx. 103 (3d Cir. 2013).

On the other hand, "a reckless disregard for the consequences of an intentional and conscious destruction of evidence, previously specially preserved for purposes of subsequent litigation, at a time when litigation is necessarily foreseeable," may constitute bad faith. <u>Bozic</u>, 912 F. Supp. at 269; see also <u>Capogrosso v. 30 River Court East Urban Renewal Co.</u>, 482 Fed. Appx. 677, 682 (3d Cir. 2012), <u>cert. denied</u>, – U.S. –, 133 S.Ct. 544, 184 L.Ed.2d 341 (2012)(finding "no reason" to justify licensed attorney's disposal of evidence she knew "would be essential in her lawsuit"). Additionally, a party's obfuscation or lying can show that she is acting in bad faith. See <u>Bull</u>, 665 F.3d at 77.

There is no question that actual suppression of evidence has

been effectuated by *someone* in this case. On July 7, 2013, an individual reinstalled Windows 7 on the target computer, thus wiping clean the information that previously existed on the computer, discarding the previous installation, and creating a new user profile. (Tr. 96-98). Such a reinstallation would not occur spontaneously without significant input by a user of the computer (Tr. 96-97); by its very nature, such action requires human intent, and typically, though not necessarily, specific intent by a person with an IT background. See id. The Court credits Gary Hunt's testimony that, with the reinstallation, "everything was just started new." Id. In addition, Mr. Hunt discovered the installation and use prior to July 7th of CCleaner and Tracks Eraser Pro. (Tr. 98-99). Mr. Hunt testified that at least some files were deleted using Tracks Eraser Pro, and that finding both of these tools on one computer is "fairly rare" in his experience. (Tr. 125, 131-32). Although Tracks Eraser Pro and CCleaner have benign uses such as system optimization, (Tr. 93, 127, 128), the Court finds innocent explanations of their use to be tenuous in the face of the fact that they were *both* used, and Windows 7 was later reinstalled as well.

The determinative question in this fourth factor, however, is whether Plaintiffs have proven that *Brennan's* actions, taken as a whole, display bad faith. As required by the Third Circuit, the Court must place Brennan's behavior on the spectrum between

20

misrepresentation, bad faith, and intentional or knowing behavior
on the one hand; and inadvertence, accidental loss, and properly-
explained withholding of evidence on the other. See Bull, 665
F.3d at 77, 79.

The Court concludes that Brennan acted intentionally and in
bad faith. First, Brennan knew with absolute certainty that the
Plaintiffs sought the information on the target computer and that
the Court had mandated its submission to a forensic exam. Cf.
Bull, 665 F.3d at 77 ("there is not one instance in which we can
verify that [plaintiff] knew that [defendant] wanted the original
notes.") Thus, Brennan was on notice that preservation of the
data on the target computer was of the utmost importance. Second,
after identifying computers from which she accessed her websites,
Brennan abruptly departed Pennsylvania for Texas. Despite the
impending production of the target computer, there is no evidence
that Brennan took any measures to safeguard its data in her
absence: she did not communicate to Ms. Cantrell the high
importance of preservation of the computer in its current form,
she did not notify her counsel of her departure, and she took no
other measures to ascertain that the computer would be secure or
available for examination in her absence. Third, Brennan's lack
of communication with her counsel caused him to misrepresent on
July 3rd that Brennan could obtain a mirror image using EZ Imager,
while in fact Brennan maintains that she was in Texas at the

time. Fourth, Brennan resisted examination of the target computer until the Court reiterated, in written form on August 6th and verbally on August 20th, that the computer must be produced. The computer was eventually turned over for forensic examination not by Brennan or her counsel, but by Ms. Cantrell's son-in-law David Borda. Meanwhile, Windows 7 was mysteriously reinstalled on the target computer on July 7th and Tracks Eraser Pro and CCleaner were employed at an unascertainable earlier date.

The Court concludes that, on balance, Brennan did not act in good faith to preserve the data on the target computer and produce it in a timely fashion. Nor was the evidence on the computer subjected to a risk of destruction due to her simple negligence or inadvertence. Instead, Brennan acted knowingly and intentionally in resisting production of the target computer for a period of over two months. She acted recklessly by departing for Texas without notification or care for compliance with the Court's order. Even if Brennan's counsel was forced to wait for periods of time on Plaintiffs' newly-appointed attorneys before initiating the exam, Brennan has not properly accounted for how Windows 7 could be reinstalled on her watch if she had been making good faith efforts to preserve the computer's data. When looked at in its totality, Brennan's course of conduct rises above mere negligence and inadvertence to effectuating actual suppression of evidence.

22

**D.   Duty to Preserve**

At the time that Windows 7 was reinstalled on the target computer Brennan had a duty to preserve the computer and any or all files contained on it in connection with this lawsuit. The duty to preserve evidence begins when litigation is pending or reasonably foreseeable. <u>Micron Technology, Inc., v. Rambus Inc.</u>, 645 F.3d 1311, 1320 (Fed. Cir. 2011). The standard is objective, asking not whether the party in fact foresaw litigation, but whether a reasonable party in the same circumstances would have reasonably foreseen litigation. <u>Id</u>. The question of reasonable foreseeability is a "flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." <u>Bull</u>, 665 F.3d at 78 (citing <u>Micron Technology, Inc.</u>, 645 F.3d at 1320). The fact that a party does not have complete control of evidence does not relieve her duty to preserve the evidence, or at least notify opposing counsel of any risk of destruction. <u>See, e.g.</u>, <u>Silvestri v. General Motors Corp.</u>, 271 F.3d 583, 591 (4th Cir. 2001)("[i]f a party cannot fulfill this duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence."); <u>Centimark Corp. v. Pegnato & Pegnato Roof</u>

23

Management, Inc., Civ.A. 05-708, 2008 WL 1995305 at *6 (W.D. Pa. 2008).

At the very latest, Brennan's duty to preserve information in connection with this litigation arose in December 2012, when she asserts that she first became aware of the suit against her. The Court's June 13, 2013 Order directing that Brennan identify all electronic devices she used unequivocally put Brennan on notice that the target computer was evidence that had to be preserved: "Defendant Watchdog shall then submit these devices and computers for a forensic examination." (Doc. No. 97 at ¶ 1). Thus, when Windows 7 was reinstalled on the target computer on July 7, 2013, Brennan was under a duty to preserve evidence on the target computer.

## E.  Sanctions

The determination of an appropriate sanction for spoliation, if any, rests with the discretion of the trial court. Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 430 (S.D.N.Y. 2004). The court has authority to sanction litigants from the joint power of the Federal Rules of Civil Procedure and the court's inherent powers. Id. Potential sanctions for spoliation include dismissal of a claim or granting judgment in favor of the prejudiced party, suppression of evidence, an adverse inference, fines, and attorneys' fees and costs. Mosaid Technologies Inc. v. Samsung Electronics Co., Ltd., 348 F.Supp.2d 332, 335 (D.N.J. 2004).

Dismissal or suppression of evidence are the most drastic sanctions. Id.

The key considerations in determining an appropriate sanction should be (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future. Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994).

Plaintiffs have asked that the following sanctions be imposed by the Court: that judgment be entered against Brennan; that Brennan and Mr. Cohen be ordered to pay attorneys' fees and costs of the independent expert and fees and costs associated with various motions;[4] that the Court order that a copy of the mirror image of the target computer be produced to Plaintiffs' counsel at Brennan's expense; and that Brennan's counsel, Mr. Cohen, be sanctioned for "intentionally misl[eading] the court about a key conference call among counsel in violation of Fed. R. Civ. P. 11(b)(4) and Pennsylvania Rule of Professional Conduct 3.3 (Candor Toward the Tribunal), and violat[ing] Rule 11(b)(3)

---

[4] These include the motion to vacate default judgment, motion to modify the June 13 Order, and all fees and costs associated with the motion for sanctions for spoliation of evidence. (Pl. Motion For Sanctions at 23).

Plaintiffs also requested the Court to deny Brennan's motion to vacate default judgment; however, Plaintiffs have since withdrawn their opposition to this motion and the Court has vacated the default judgment. (Doc. No. 147).

by improperly presenting an affidavit that contained false, self-serving statements." (Pl. Supp. Brief at 7). Brennan opposes these sanctions and argues that, even assuming spoliation occurred, plaintiffs cannot show prejudice because they justified their need for the data of the target computer based on their opposition to Brennan's Motion to Vacate Default, (Def. Supp. Brief at 4-5), to which they later withdrew their opposition. See (Doc. No. 147).

At the outset, the Court notes that the prejudice to Plaintiffs resulting from the spoliation appears minimal. The original impetus for obtaining the forensic examination of the target computer was to discern whether Brennan had received alternative service of process and thus inform the Court's analysis of the Motion to Vacate Default. Prior to the spoliation hearing, Plaintiffs withdrew their opposition to Brennan's Motion to Vacate Default Judgment and the Court subsequently vacated the Default. Since the vacatur, Plaintiffs have not presented any arguments as to how the spoliation has prejudiced the ultimate merits of their case.[5]

The Court thus finds only the following sanctions to be

---

[5] Plaintiffs argued prior to the hearing that "Brennan's spoliation causes incalculable prejudice not only with respect to both the motion to vacate and the ultimate merits in this case, but also to a related case pending in the Montgomery Court of Common Pleas." (Pl. Mot. at 3). Any prejudice to the Motion to Vacate is now moot, and the Court of Common Pleas case is not relevant in this Court's analysis. Plaintiffs do not further show, in either their Motion for Sanctions (Doc. No. 134) or in their supplemental brief (Doc. No. 153), how the ultimate merits of their case are prejudiced.

appropriate: Brennan will pay the costs of the ITA independent expert Gary Hunt and attorneys' fees associated with Plaintiffs' Motion for Sanctions Based On Spoliation of Evidence (Doc. No. 134). This sanction will compensate Plaintiffs for the money and effort expended on determining whether Brennan received alternative service of process and those relating to the present motion.

The Court denies, at this time,[6] Plaintiffs' request for a mirror image of the target computer to be produced to Plaintiffs' counsel at Brennan's expense. Plaintiffs argue that they "need the copy of the mirror image for the continued prosecution of this action and the action pending in the Montgomery County Court of Common Pleas to the extent that the bits of data in the unallocated space provide additional information." (Pl. Mot. at 23). The Court will not order a mirror image so that Plaintiffs may use it in another court case. Moreover, Plaintiffs have not explained what sort of "additional information" expected to be on the target computer would aid in their prosecution of this case, and how it would do so. Instead, the fact that the unallocated space may contain privileged communications between Brennan and counsel (Def. Resp. at 37) or privileged information belonging to Ms. Cantrell cautions against the production of a mirror image of the target computer at the present time.

---

[6] The Court may entertain the request for production of a mirror image of the target computer as a separate motion, if Plaintiffs wish to pursue it.

The Court will not order Brennan to pay the costs associated with non-spoliation motions given that Plaintiffs abruptly dropped their opposition to Brennan's Motion to Vacate Default Judgment after extensive briefing by both parties.

Nor will the Court enter judgment against Brennan because the evidence before the Court does not rise to the nefarious level typically needed to impose such a severe sanction. See, e.g., U.S. v. $8,221,887.16 in U.S. Currency, 330 F.3d 141, 161 (3d Cir. 2003)("the sanction of dismissal is disfavored absent the most egregious circumstances."); Micron Technology, Inc. v. Rambus Inc., 917 F.Supp.2d 300, 324 (D. Del. 2013); Medina ex rel. Beteta v. Rose Art Industries, Inc., Civ. A. 02-cv-1864, 2003 WL 1877563 at *1 (E.D. Pa. Feb. 28, 2003)(citing Baliotis v. McNeil, 870 F.Supp. 1285, 1289 (M.D. Pa. 1994)("[a] sanction that has the drastic result of judgment being entered against the party who has lost or destroyed evidence must be viewed as a last resort, to be imposed only if no alternative remedy by way of a lesser, but equally efficient sanction is available.")).

The Court will not impose a spoliation inference on Brennan because Plaintiffs' suggested inference is no longer relevant to the present proceedings. A spoliation inference typically allows a jury to assume that the destroyed evidence would have been unfavorable to the position of the offending party. Williams v. Klem, 3:07-cv-1044, 2010 WL 3812350 at *2 (M.D. Pa. Sep. 22,

2010)(citing <u>Schmid</u>, 13 F.3d at 78); <u>see also</u> See Medina, 2003 WL
1877563 at *1. Plaintiffs requested an inference that Brennan
received alternative service of process on August 30, 2012, and
had appropriate notice of the litigation. (Pl. Mot. at 1, 22).
Such an inference would have no bearing on the merits of this
case given the vacatur of default.

The Court will also not sanction Mr. Cohen for professional
misconduct. Though Ms. Cantrell did not read her affidavit before
signing it, Mr. Cohen did ask her to read it very closely. (Tr.
60). Moreover, at the evidentiary hearing, Mr. Cohen did not
dispute that he suggested that Brennan use EZ Imager to obtain a
copy of the target computer. There is evidence that EZ Imager is
a viable, legally-valid alternative to delivering the target
computer to ITA. (Def. Ex. C). And despite Plaintiffs'
characterizations to the contrary, Mr. Hunt testified that he
could not remember whether Mr. Cohen had suggested that Brennan
would be the one to use the USB Drive to obtain a mirror image
without Ms. Cantrell's knowledge. <u>See</u> (Tr. 84-85). The Court does
not believe that the evidence proves that Mr. Cohen has engaged
in sanctionable conduct.


**CONCLUSION**

For the foregoing reasons, the Court GRANTS in part and

29

DENIES in part Plaintiffs' Motion for Sanctions Based on Spoliation of Evidence.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

FIRST SENIOR FINANCIAL GROUP  :
LLC, PHILLIP J. CANNELLA, III :
AND JOANN SMALL,              :
                             :
           Plaintiffs,        :    CIVIL ACTION
                             :
      v.                      :    NO. 12-cv-1247
                             :
"WATCHDOG," AND JOHN DOE      :
DEFENDANTS 1-9,               :
                             :
           Defendants.        :

<u>**ORDER**</u>

AND NOW, this 3rd, day of April, 2014, upon consideration of Plaintiffs' Motion for Sanctions Based on Spoliation of Evidence (Doc. No. 134) and Defendant's Response in Opposition thereto (Doc. No. 138); Plaintiffs' (Doc. No. 153) and Defendant's (Doc. No. 154) Supplemental Briefs; as well as Defendant's Response to Plaintiff's Supplemental Brief (Doc. No. 158), it is hereby ORDERED as follows:

(1) Krista C. Brennan shall pay all fees associated with IT Acceleration's work performed in connection with the forensic examination of the Target Computer.[7] Because Plaintiffs have already paid $850.00 to IT Acceleration, Krista C. Brennan shall reimburse Plaintiffs for those fees. The sum of $5,665.26, which constitutes the remaining fees, shall be the responsibility of Krista C. Brennan. To the extent that the Court previously

---

[7] The "Target Computer" is the HP Pavilion Notebook Computer in the possession of Rose Ann Cantrell. <u>See</u> (Order of August 6, 2013, Doc. No. 115).

ordered Plaintiffs to pay for the forensic examination, such portion of those orders are hereby rescinded.

(2) Krista C. Brennan shall pay for all of Plaintiffs' fees and costs associated with Plaintiffs' Motion for Sanctions (Doc. No. 134), Supplemental Brief in Further Support thereof (Doc. No. 153), as well as costs and fees associated with the Evidentiary Hearing held on February 18, 2014 (Doc. Nos. 149, 150).

(3) Plaintiffs are MANDATED to submit, within fourteen (14) days of the date of entry of this Order, an affidavit and/or other materials detailing their costs and fees associated with (2) above. Plaintiffs' submission of costs and fees should contain, at minimum, a description of work completed, time expended on various tasks, and the hourly rate charged.

Defendant Brennan shall have 14 days after submission of this affidavit to file a response, if any.


BY THE COURT:

/s/ J. Curtis Joyner
_____
J. CURTIS JOYNER, J.